Adam M. Apton
LEVI & KORSINSKY, LLP
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ERIC BARTA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NOVO NORDISK A/S,  MAZIAR MIKE DOUSTDAR, LARS FRUERGAARD JØRGENSEN, KARSTEN MUNK KNUDSEN, AND DAVID S. MOORE<br><br>Defendants. | Case No. 2:25-cv-14045<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>Demand for Jury Trial |

Plaintiff Eric Barta ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and

analysis of relevant filings made by Novo Nordisk A/S ("Novo" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Novo's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## **NATURE OF THE ACTION**

1.    This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Novo securities between May 7, 2025, to July 28, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.    Defendants provided investors with material information concerning Novo's expected sales and revenue growth for the fiscal year 2025. Defendants' statements included, among other things, confidence in the Company's ability to continue to grow GLP-1 sales by capitalizing on the significant size, low penetration, and overall potential of the GLP-1 market, including Novo's ability to capitalize on

patients who would purportedly be no longer able to utilize their preferred compounded GLP-1 alternatives.

3.    Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Novo's growth potential; notably, that its asserted potential to capitalize on the compounded market greatly understated the potential impact of the personalization exception to the compounded GLP-1 exclusion and overstated the likelihood such patients would switch to Novo's branded alternatives, and further greatly overstated the potential GLP-1 market or otherwise Novo's capability to penetrate said markets to achieve continued growth. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Novo's securities at artificially inflated prices.

4.    On July 29, 2025, Novo announced it was lowering its sales and profit outlook ahead of reporting its results for the second quarter of fiscal year 2025. The Company attributed the guide down on "lowered growth expectations for the second half of 2025" for both Wegovy and Ozempic due to "the persistent use of compounded GLP-1s, slower-than-expected market expansion and competition."

5.    Investors and analysts reacted immediately to Novo's revelation. The price of Novo's common stock declined dramatically. From a closing market price

of $69.00 per share on July 28, 2025, Novo's stock price fell to $53.94 per share on July 29, 2025, a decline of about 21.83% in the span of just a single day.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Novo's US headquarters are located in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased Novo common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Novo is attached hereto.

12.     Novo Nordisk A/S is a Danish corporation with its United States principal executive offices located at 800 Scudders Mill Road, Plainsboro, NJ 08536

13.     During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "NVO."

14.     Maziar Mike Doustdar ("Doustdar") was, at all relevant times, the Executive Vice President of International Operations and a Member of the Management Board of Novo. On July 29, 2025, Novo announced Doustdar would be taking over the roles of President and Chief Executive officer of Novo on August 7, 2025.

15.     Defendant Lars Fruergaard Jørgensen ("Jørgensen") was, at all relevant times, the President, Chief Executive Officer, and a Member of the Management Board of Novo. On July 29, 2025, Novo announced Jørgensen will be stepping down from his roles on August 7, 2025.

16.     Karsten Munk Knudsen ("Knudsen") was, at all relevant times, the Executive Vice President, Chief Financial Officer, and a Member of the Executive Board of Novo.

17.     David S. Moore ("Moore") was, at all relevant times, the Executive Vice President of US Operations and a Member of the Management Board of Novo.

18.     Defendants Doustdar, Jørgensen, Knudsen, and Moore are sometimes referred to herein as the "Individual Defendants." Novo together with the Individual Defendants are referred to herein as the "Defendants."

19.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Novo's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements

pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

20.    Novo is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

21.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Novo under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

22.    Novo is a healthcare company, focused on the research, development, manufacturing, and distribution of pharmaceutical productions globally. The Company operates in two segments, diabetes and obesity on one arm, and rare diseases on the other.

23.    Novo is internationally headquartered outside of Copenhagen, Denmark, while its United States headquarters are located in Plainsboro, New Jersey.

***The Defendants Materially Misled Investors Concerning***

***Novo's Revenue Outlook for Fiscal Year 2025***

<u>*May 7, 2025*</u>

24.    On May 7, 2025, Defendants published their first quarter fiscal 2025 earnings and conducted an earnings call to discuss the results. During the call, Defendant Moore discussed the Company's current US market sales trends, stating, in pertinent part:

> ***Sales of GLP-1 diabetes care products in the U.S. increased by 10% in the first 3 months of 2025. The sales increase was mainly driven by the continued uptake of Ozempic***. Following the U.S. approval of the FLOW data earlier this year, ***Ozempic is now the only GLP-1 receptor agonist proven to reduce the risk of chronic kidney disease and people living with type 2 diabetes and chronic kidney disease.*** Novo Nordisk remains the market leader in the U.S., with more than 50% market share measured by total monthly prescriptions.
>
> . . .
>
> In February, the FDA removed semaglutide from the drug shortage list. ***As a result, it is now illegal under U.S. compounding laws to make or sell compounded semaglutide drugs, except with rare exceptions.*** Novo Nordisk is working to prevent unlawful and unsafe compounding of semaglutide in the U.S., while making sure patients have access to safe, legitimate semaglutide produced by Novo Nordisk.
>
> . . .
>
> In March, we introduced self-pay, a direct-to-patient delivery of all doses of Wegovy at a reduced cost of USD 499 per month through our Novocare Pharmacy. Access to Wegovy for cash-paying patients was further expanded in April with the announcement of collaborations with 3 telehealth organizations. And last week, it was announced that CVS

chose Wegovy to be the only GLP-1 medicine covered for obesity on its national template formulary as of July 1, 2025.

(Emphasis added).

25.    Similarly, Defendant Doustdar discussed Novo's performance in its

International Operations ("IO"), stating, in pertinent part:

> Ozempic remains the leading GLP-1 diabetes product within IO, having launched in around 80 markets. ***With improved supply, we are now fully focused on our promotional activities to further expand the number of patients reached***.
>
> Also, within obesity, ***we see a substantial unmet need with more than 800 million people living with obesity in IO and only a few million of these people being treated***. We have launched Wegovy in around 25 countries, including 3 in just the last month, reflecting a greater supply availability and staying true to our commitment in reaching more and more patients. We look very much forward to rolling out Wegovy in many more markets as the year goes through.

(Emphasis added).

26.    Defendant Knudsen then took over the call to discuss the quarterly

results and, more pertinently, outline Novo's updated guidance following both the

HIMS partnership and the FDA's announcement regarding compounded GLP-1s,

stating:

> ***For 2025, the range for sales growth is now expected to be 13% to 21%*** at constant exchange rates … ***The new range reflects lower-than-planned penetration of branded GLP-1 treatments in the U.S. impacted by compounded GLP-1s.***
>
> The outlook reflects expectations for sales growth in U.S. operations and international operations, ***mainly driven by volume growth of GLP-1-based treatments for obesity and diabetes***. Following the U.S. FDA

removal of semaglutide injectables from the drug shortage list, the sales outlook assumes a reduction in patients on compounded GLP-1 treatments during the second half of 2025.

. . .

**Operating profit growth is now expected to be 16% to 24%** at constant exchange rates … The updated expectation for operating profit growth primarily reflects the lower sales growth outlook, partially countered by reduced spending.

(Emphasis added).

27.    A question-and-answer segment followed, during which Defendants fielded multiple questions concerning their guidance and, more particularly, the impact of compounded alternatives and plans going forward during the following pertinent exchanges:

<Q: Richard Vosser – JPMorgan Chase & Co – Head of European Pharma & Biotech> . . . You've obviously done a partnership with Hims, but Hims themselves are suggesting that they will continue to personally compound and have a significant contribution to their business from personal compounding. That seems to be at odds with the partnership and odds with your commentary of trying to reduce compounding and it being only allowed in rare circumstances. So could you just talk about how you expect that to go and how you expect to deal with that in the second half?

<A: David S. Moore> … To be clear, **we do not support a lawful compounding**. **We are against the illegal importation and the continuation of compounding in the United States**. As you mentioned, we did announce collaborations with telehealth providers. The reason for this is increasingly **people living with obesity are seeking health care through telehealth companies. And we need to be where patients are and to have an offering for the real Wegovy. These collaborations**

***allow a link to Novocare Pharmacy, where the real Wegovy can be available through these telehealth companies.***

As we've mentioned, on May 22, we fully expect the FDA to enforce the law. And at that time, ***we will continue to fight against unlawful compounding, for example, mass personalization.***

. . .

<Q: James Patrick Quigley – Goldman Sachs Group, Inc. – Research Analyst> So one on the guidance and one follow-up on the compounding pharmacy. So on the guidance, if we sort of assume a similar second quarter as in the first quarter, then the scenarios for progression in the second half are quite wide with around 8% growth at the bottom end and 22%, 23% growth at the upper end. So could you reconcile the potential outcomes? What are the most important variables there? And what are the key assumptions for both end of those variables?

And secondly, on compounding. You mentioned that having a significant impact, but have you got any more details of what the drag is on Wegovy market share? And have you done any surveys or how - - of what you think how many patients might drop off versus switch to branded and the branded switch to the Wegovy versus switching to tirzepatide because you mentioned you have factored that into the guidance, just wondering how much that is factored into the guidance?

<A: Karsten Munk Knudsen> … So specifically to the guidance ranges, this means ***in terms of the main drivers that a lot of patients on compounded products will go to branded products in the second half of this year, and we will be able to enable that through the cash channel and Novocare and the telehealth collaborations***.

. . .

And I would say on compounding specifically, given that the data quality on a number of patients on compounding is not very high, then it's based on market research, where ***we're looking at 1 million or more patients on compounded GLP-1 today. And then we've made estimates based on how many patients will either be able to benefit***

**from the personalized exception or will drop off treatment. And as a consequence, the rest will go to a branded product.**

. . .

<Q: Peter Verdult – BNP Paribas Exane – Research Analyst> . . . I suppose I'm still struggling just to understand where the disconnect has been with respect to your messaging given at February CMD in London about commercial execution being management's top priority and the prescription trends we've seen since then, especially when you have, as you said, 40 million commercial lives where most patients apparently only have to pay $25 a month to get access to Wegovy and you've been smashing it with DTC and reps. So is it really only about the compounders? Or do we have to consider your nearest branded competitor doing a better job?

<A: Lars Fruergaard Jørgensen> . . . You are right, this has been our focus for some time. But I think it's important to say that when you assess that **based on script trends, it is really, really difficult as there is a significant share of the business turning into being compounded, and we estimate that that's a similar amount of business as what we have in the U.S. on GLP-1**. So I think Dave outlined our tactics, and we feel honestly very confident that we -- **this is the right moment for us to make a serious change in the market, and that's baked into our guidance for the second half of the year.**

. . .

<Q: Sachin Jain – BofA Securities – MD & Research Analyst> So firstly, on the compounded sema sort of patient funnel, Karsten, if you could just give us any color as to what you're assuming for the inventory in the system. We've heard estimates as anywhere between 3 and 12 months.

And then any color on what percentage you expect to shift to branded given that there are on compound because they can't afford it or it's not covered.

. . .

And then finally, a lot of what we've discussed has been the obesity market, but I wonder if you could touch on Ozempic. I'd assume limited compounding impact, markets slowing down, you're losing share from Mounjaro. So it's not exactly clear to me what changes there second half.

<A: Karsten Munk Knudsen> . . . So you're correct that within telehealth, the setup is more towards a subscription basis on 3, 6, 9, even 12 months, where patients get the incentive through a lower subscription rate if they sign up for a longer period of time. ***So yes, most likely, there will be some patients sitting within inventory on May 22. We don't have really good data on that, but that's also why we're cautioning in our outlook section of our company announcement that the market should expect a step up mainly in the second half of this year from compounding*** and of course, the CVS contract.

<A: David S. Moore> . . . As Karsten mentioned, of ***the total number of compounded patients today, some will drop off. But certainly, as you mentioned in our guidance, we do expect to capture and see a real interest in patients coming over to the real Wegovy.***

And then I'll shift over to Ozempic, Sachin. As we're seeing this year so far, the ***growth of the GLP-1 class, it does continue***. It's lower than what we've seen in years past at 15%, but that ***still leaves plenty of opportunities still runway for future*** growth. And this continues to be a game around NBRx and our commercial leverage.

. . .

<Q: Jo Walton – UBS Investment Bank – Analyst> You've talked a lot about pricing and your strong commercial focus. Could you give us an idea of what you think a typical price point would be for a compounded semaglutide? And how far a drift that is of the $500 that you're charging? The reason that I ask is I assume that this is a price-sensitive market. And yet the starter dose from your competitor is only $350. And I wonder whether people just can't move step-up from whatever they're paying today up to that $500 and the $350 is a very compelling starting point for the compounder.

13

<A: David S. Moore> . . . As you pointed out, it is less for the compounded GLP-1 than what we're seeing in terms of the cash prices, no question.

***When we think about the funnel and when we talked about the guidance and expectations, as Karsten mentioned, certainly, we do expect some patients not to transition, meaning they may be on a compounded GLP-1 and they may not transition over to a branded medication***. One of the things that's important for us, though, is to ensure that we are educating around the availability of Wegovy through commercial insurance.

***We have over 55 million Americans that have coverage for Wegovy, where they would receive the medicine for a low branded copay***. And what we've learned is many patients on compounded GLP-1 do have insurance. So educating them, doing insurance verification as part of our commercial efforts is also important.

(Emphasis added).

*May 8, 2025*

28.    On May 8, 2025, Novo conducted a second earnings call, the "Novo First Quarter 2025 events post results," during which the company reiterated much of the prepared remarks from the May 7 earnings call.  A question-and-answer segment similarly followed, where Defendants made additional remarks and disclosures regarding their guidance and the impact of GLP-1 compounding during the following pertinent exchanges:

<Q: Emily Field – Barclays Bank PLC – Head of European Pharmaceuticals Equity Research> . . . Reading through the comments from yesterday's call, it does seem that you are -- and with the launch of NovoCare and that you're expecting sort of the cash pay portion of Wegovy to increase in the second half. However, we've obviously seen

a lot of consumer-focused companies worried about consumer softness in the U.S. with the economic situation there. So are you -- within your revised guidance range, are you anticipating any consumer softness? Or if you could just provide context how you're thinking about -- what will still be a relatively expensive out-of-pocket product?

<A: Karsten Munk Knudsen> Yes. So as I also said at the call, *estimating the cash channel for us linked to compounding and telehealth agreements stands on a number of assumptions*. So the way we've been -- a number of assumptions and somewhat limited data quality. *So that's what we built into our guidance*. And the way we've done it is basically triangulate from different aspects. *One is the amount of people we currently estimate is on compounded product today, especially bulk compounded products, how many will switch to branded and, hence, get into the cash channel as one element*. And then whatever data we otherwise can see in terms of cash channel penetration and telehealth impact.

So based on that, we have made an estimate on what is realistic in our view to put into our guidance on Wegovy cash channel throughout the -- especially the second half of this year.

. . .

<Q: Unknown Analyst> . . . The question is, if we -- if you indulge me with -- you've got about, say, 3 million or so patients in the U.S. on Wegovy, right? -- not Wegovy, all the brands, right, across, including compounders.

And the 90 million potentially obese patients, let's say, 1/3 of them have access with the access you have*. We, in theory, are scratching the surface of a very large market, right? Your penetration rates are quite low. I'm quite puzzled*. You've had Lilly 2 quarters of destocking. Your growth got impaired by compounders in the first quarter when we are scratching the surface of a very large market. All the sell-side brokers like me have built their models for claiming the market is 120, 150, 200, I don't know, everyone has a big number.

But does this make you stop in your tracks ask the question, is there any other rate-limiting step in realizing that market size, which might --

because I mean, ***if the market is that large, why compounded matter at this low level of penetration?*** I'm unable to get my head around it. So I'm very curious on how you would think about the problem?

<A: Lars Fruergaard Jørgensen> I think it's a great question. So I think it started with the classical market structure with PBMs, insurance companies and ultimately, let's say, at large employers paying. And it started with opting in and relative easy access, core starts growing, and then a lot of friction is put in and it becomes difficult to get access. ***So I think in totality, the stack of players have not succeeded in actually unlocking the value of treating obesity because there is actually a tremendous health benefit***. So that was data out recently from [indiscernible] about -- when you do obesity treatment, there's a cost year 1, but actually, you start saving costs already from year 2.

***So we haven't fully gotten to the perfect transaction model in untangling that. So when we build a cash model, of course, right now, serving individual patients with telehealth, but it's also building the opportunity to actually engage with large payers***.

. . .

You can say in European health care systems, you have a lot of experience in how do you sanction rational use of medicines based on health technologies. But in the U.S., it's like, I have a right to access, and there's no discrimination so far. I'm not advocating for discrimination, ***but you need to understand individual patient needs and what's the value of doing that***. And I think this will be coming as more models are built, and that will also put pressure on the existing, say, chain in actually coming up with that solution to payers. So I think this will happen over the relative short term. I think we'll see that will unlock a lot. And then you will have the cash channels, so more channels being opened up, and access will increase.

(Emphasis added).

*May 16, 2025*

29.     On May 16, 2025, Novo issued a press release announcing Defendant Jørgensen would step down as the President and CEO of Novo, pending a search for his successor. A special call was conducted the same day to discuss the news.

30.     During the question-and-answer segment of the call, analysts inquired as to the reasoning for the departure and any potential impact on the Company's outlook during the following pertinent exchanges:

<Q: Sachin Jain – BofA Securities – MD & Research Analyst> . . . could you clarify whether the guidance still stands? You said the plans are supported by the Board, but you didn't officially say the guidance still stands

<A: Helge Lund> ***There are no changes to the guidance that we've given in the first quarter.***

. . .

<Q: Rajesh Kumar – HSBC – Head of European Life Sciences & Healthcare Research> So if I understand correctly, your strategy is unchanged. Your guidance is in place. The main reason for the change is what happened to the share price and communication. So first part of the question is, what could have been done different in the past, which you'll focus on in the future? And second, are there any other organizational changes that are happening along with the CEO succession?

<A: Heldge Lund> So just to go back to what I said earlier, ***the reason for this is based on recent market challenges, the share price sort of declined over the past 6 months or so as well as a request and a wish from the foundation of an accelerated succession process***. And that is the basis on which the Board has made its decision. And an organization is an organism. It changes and evolve all the time, and we do that as well at Novo Nordisk, but ***there are no significant changes that I think***

*is relevant to report to investors at this stage beyond what we have communicated over the past few months on changes in the executive leadership team.*

(Emphasis added).

<u>June 23, 2025</u>

31.    On June 23, 2025, Novo issued a press release announcing that it terminated its partnership with Hims & Hers Health, Inc. ("HIMS") after only one month, removing direct access to Wegovy to HIMS via the NovoCare Pharmacy on the claim that "[o]ver one month into the collaboration, Hims & Hers Health, Inc. has failed to adhere to the law which prohibits mass sales of compounded drugs under the false guides of 'personalization' and are disseminating deceptive marketing that put patient safety at risk." Novo fell short of articulating why the personalization exemption would not apply for HIMS' products.

32.    Novo further claimed that, based on its own investigation into unnamed telehealth entities, "the 'semaglutide' active pharmaceutical ingredients that are in the knock-off drugs sold by telehealth entities and compounding pharmacies are manufactured by foreign suppliers in China." While Novo further quoted a Brooking Insitute report suggesting Chinese suppliers lack FDA inspection, there was no direct assertion any entity utilizing the personalization exemption, let alone HIMS specifically, was doing so.

33.     Notably, upon information and belief, HIMS continues to market and sell personalized compounded GLP-1 semaglutide and has not been ordered to cease doing so by the FDA.

34.     Upon further information and belief, Novo has not commenced litigation against HIMS to cease this practice.

35.     HIMS, for its part, responded the same day via a post on X from its Founder and CEO Andrew Dudum, stating:

> We are disappointed to see Novo Nordisk management misleading the public.
>
> In recent weeks, Novo Nordisk's commercial team increasingly pressured us to control clinical standards and steer patients to Wegovy regardless of whether it was clinically best for patients. We refuse to be strong-armed by any pharmaceutical company's anticompetitive demands that infringe on the independent decision making of providers and limit patient choice.
>
> We take our role of protecting the ability of providers and patients to control individual treatment decisions extremely seriously, and will not compromise the integrity of our platform to appease a third party or preserve a collaboration. The health and wellness of individuals always comes first.
>
> We will continue to offer access to a range of treatments, including Wegovy, to ensure providers can serve the individual needs of patients.

36.     The above statements in Paragraphs 24 to 35 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risks from competition and

macroeconomic fluctuations. In truth, Novo's optimistic reports of growth, cost cutting measures, and its overall potential and ability to continue to capitalize upon both the compounded and unreached GLP-1 markets fell short of reality; Novo repeatedly ignored and minimized the significance of the personalization exception for GLP-1 compounding, greatly overestimated its ability to capture patients coming off of compounded treatments, and was ultimately ill equipped to capitalize upon the purported significant unmet patient population.

### The Truth Emerges during Novo's Announcement Regarding its Full-Year Outlook

#### *July 29, 2025*

37.    On July 29, 2025, Defendants published a press release, announcing that "Novo Nordisk lowers sales and operating profit for 2025."  In pertinent part, Defendants announced that, "In the first six months of 2025, Novo Nordisk's sales increased by 18% and operating profit increased by 29%, both at [constant exchange rates]."

38.    While previously Novo had anticipated significant growth in the second half of 2025, Defendants announced a slashed 2025 guide as follows:

| Outlook 2025 | Expectations 29 | Expectations 7 |
|---|---|---|
| Sales growth | 8-14% | 13-21% |

| Operating profit growth | 10-16% | 16-24% |
|---|---|---|

39.     In pertinent part, Defendants elaborated on the guidance cut as follows,

stating:

*The lowered sales outlook for 2025 is driven by lower growth expectations for the second half of 2025*. This is related to lower growth expectations for Wegovy® in the US obesity market, lower growth expectations for Ozempic® in the US GLP-1 diabetes market, as well as lower-than-expected penetration for Wegovy® in select IO markets.

*For Wegovy® in the US, the sales outlook reflects the persistent use of compounded GLP-1s, slower-than-expected market expansion and competition.*

*Despite the expiry of the FDA grace period for mass compounding on 22 May 2025, Novo Nordisk market research shows that unsafe and unlawful mass compounding has continued, and that multiple entities continue to market and sell compounded GLP-1s under the false guise of 'personalisation'.* Novo Nordisk is pursuing multiple strategies, including litigation, to protect patients from knockoff 'semaglutide' drugs. Novo Nordisk is deeply concerned that, without aggressive intervention by federal and state regulators and law enforcement, patients will continue to be exposed to the significant risks posed by knockoff 'semaglutide' drugs made with illicit or inauthentic foreign active pharmaceutical ingredients.

*As unsafe and unlawful mass compounding continues, the Wegovy® penetration within the cash channel has been lower-than-expected*. Within this channel, NovoCare® Pharmacy was launched in March 2025. Wegovy® prescriptions via NovoCare® Pharmacy (including TeleHealth collaborations) amount to around 11,000 total weekly prescriptions, in addition to around 20,000 weekly prescriptions in the retail cash channel. Novo Nordisk will continue to invest in the

expansion of direct-to-patient initiatives such as NovoCare® Pharmacy and further collaborations with telehealth organisations.

Within the insured channel, despite the initiation of new commercial activities of Wegovy® in the first half of 2025, the sales outlook also reflects lower-than-expected penetration for Wegovy®, ***mainly due to slower market expansion and competition.***

. . .

For ***Ozempic®***, the updated outlook is ***negatively impacted by competition*** in the US. Novo Nordisk continues to invest in commercial activities and label updates towards driving further market penetration of Ozempic

Finally, while IO Wegovy® sales are growing at high rates and launches are progressing, the ***sales outlook reflects lower-than-expected penetration for Wegovy® in select IO markets due to slower market expansion and competition.*** With around 1 billion people living with obesity globally and only a few million on treatment, the outlook reflects a continued global rollout of Wegovy® to more markets.

The updated expectation for operating profit growth reflects the lower sales growth outlook, partially countered by reduced spending. A negative mid-single-digit operating profit growth impact related to the acquisition of the three former Catalent manufacturing sites remains included in the guidance.

(Emphasis added).

40.    The same day, Defendants issued a second press release, announcing Defendant Doustdar was appointed President and Chief Executive Officer, to succeed Defendant Jørgensen, who will step down from the roles on August 7, 2025.

41.    A conference call was scheduled for the same morning to elaborate upon and field questions regarding Novo's announcements.  While the prepared

remarks merely mirrored the press release, Defendants elaborated further on the guidance cut during the following pertinent exchanges that occurred in the subsequent question-and-answer segment:

<Q: Sachin Jain – BofA Securities – MD & Research Analyst> I just wanted to get a better understanding of what you're assuming for both Wegovy and Ozempic as we exit this year and into next year. So for Wegovy, I guess you're citing the main issue being compounders. So any color on how many patients still do you think compounded versus 1 million prior? And outside of litigation, which I guess could take quite a while. Is there anything that you can point to that would change that on a 6- to 9-month time frame?

And I guess similar question on Ozempic, you have much looser commentary within the PR around path to growth. Comp remains tough, scripts aren't inflecting, assuming given the 5% to 10% price decline, fair to think that Ozempic is now trending towards sales declines from here?

<A: Karsten Munk Knudsen> … So specifically on compounding at Q1 in May, we said that our market research estimate was 1 million patients using compounded GLP-1 for obesity treatment. Then the FDA grace period for all compounding on the 503b ended on May 22, and our assumption was that, that would lead to increased patients using branded GLP-1s in the second half of this year. Unfortunately, our latest market research indicates that, that has not happened, and that's one of the assumptions that we have changed. So the latest market research still indicates 1 million patients or more being on compounded GLP-1 obesity the U.S. market.

<A: David S. Moore> … Yes, in regards to your question about **Ozempic**, we are seeing a **flattish TRx development** currently. We're seeing approximately 690,000 TRxs per week on par with competition. **But the current competitive dynamics, we see we're capturing about 40% of the NBRx, and we do see patients switching from Ozempic to the competitor product as well. We haven't seen a solid pickup from our newly approved indication in chronic kidney disease**, although we

do hear positive comments from clinicians. We haven't seen that materialize into prescriptions as of yet.

And then secondly, we continue to see slower class growth of GLP-1 diabetes. ***And to some degree, there is also an impact from compounding, Meaning if someone is coming in and looking for Ozempic branded product, it is possible that they would end up on a compounded semaglutide.***

<A: Karsten Munk Knudsen> Yes. So just adding on to my prior comments on compounded GLP-1s in the U.S. marketplace, it's important that this is something we don't take lightly. It's a key safety concern. And of course, we are active on many, many fronts in [indiscernible] improving patient safety and using compounding to what is legally allowed. So we -- and most other things are active in litigations and we're working with regulators. And of course, we are ***hopeful*** that this ***can***, ***over time***, lead to a reduction in compounding and hence, a ***potential*** inflow of additional patients into the branded segments.

. . .

<Q: Emily  Field – Barclays Bank PLC – Head of European Pharmaceuticals Equity Research> I just wanted to kind of dig into these efforts to limit compounding. Your company has been very consistent in this message around safety but for better or for worse, that's not really resonating with whatever the subsegment of American patients. So -- and the prior answer, Dave, you mentioned the lawsuits and the season [sic] desist letters. ***But have you followed [sic] suit against Hims?*** Can you see preliminary injunctions as part of these lawsuits?

***Given that we're off the drug shortage list, we all expected compounding to come down following this May 22 grace period date***. So I guess I sort of was wondering what is within the company's purview to get more aggressive in getting this to stop and defend your IT and defend your product?

<A: David S. Moore> Yes, absolutely. Happy to expand on that. So we won't rule out anything categorically. All legal actions as well as efforts

24

that we can take with the government as well as taking legal actions. So no ruling any of that out. We can't comment on specific lawsuits, and we wouldn't do that. We wouldn't comment on legal strategies either but certainly pursuing all angles to ensure that we get this back to a branded market. We believe in our brands, and we believe in the opportunity and confident in our ability to compete in a branded pharmaceutical market.

42.    The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the May 7, May 8, May 16, and June 23, 2025, releases and shareholder calls. On those calls, Defendants continually emphasized the significant size, low penetration, and overall potential of the GLP-1 market and expressed strong confidence in their guided growth for the second half of 2025; while continually minimizing the significance of the personalization exception for GLP-1 compounding, the possibility that the majority of those patients on compounded alternatives might not switch to branded Wegovy or even Ozempic; and the risks associated with ongoing competition, continued consumer softening due to macroeconomic pressures, and a potential slowdown in the GLP-1 market.

43.    Investors and analysts reacted immediately to Novo's revelation. The price of Novo's common stock declined dramatically. From a closing market price of $69.00 per share on July 28, 2025, Novo's stock price fell to $53.94 per share on July 29, 2025, a decline of about 21.83% in the span of just a single day.

25

44.    A number of well-known analysts who had been following Novo lowered their price targets in response to Novo's disclosures. For example, CFRA, while considerably reducing their price target by 1/3, highlighted that "Novo cut guidance the second time this year as compounded GLP-1s and competition continue to hurt sales."  The analyst further cautioned that Novo's new CEO "will face a daunting task of reviving a company grappling with multiple challenges, notably the sharply slowed growth."

45.    The fact that this analyst, and others, discussed Novo's shortfall, guidance cuts, and below-expectation projections suggests the public placed significant weight on Novo's prior claims and estimates of sales and profit growth. The frequent, in-depth discussion of Novo's guidance confirms that Defendants' statements during the Class Period were material.

### *Loss Causation and Economic Loss*

46.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Novo's common stock and operated as a fraud or deceit on Class Period purchasers of Novo's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the

price of Novo's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Novo's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

47.    Novo's stock price fell in response to the corrective event on July 29, 2025, as alleged *supra*. On July 29, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Novo's forecasting processes and growth guidance.

48.    In particular, on July 29, 2025, Novo announced that it "lowered sales and operating profit outlook for 2025," reducing their own prior sales and profit growth guidance for fiscal year 2024, each by at least 35% at the midpoint.

### *Presumption of Reliance; Fraud-On-The-Market*

49.    At all relevant times, the market for Novo's common stock was an efficient market for the following reasons, among others:

(a)    Novo's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)    Novo communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services;

(c)     Novo was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Novo was reflected in and incorporated into the Company's stock price during the Class Period.

50.     As a result of the foregoing, the market for Novo's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Novo's stock price. Under these circumstances, all purchasers of Novo's common stock during the Class Period suffered similar injury through their purchase of Novo's common stock at artificially inflated prices, and a presumption of reliance applies.

51.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor

might have considered the omitted information important in deciding whether to buy or sell the subject security.

*No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

52.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with sales and profit projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in growth and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

53.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

54.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an

executive officer of Novo who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Novo's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

56.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Novo's common stock were actively traded on the NSYE. While the exact number of Class members is unknown to

Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Novo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of February 5, 2025, there were 3.39 billion shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

57.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Novo;

(c)    whether the Individual Defendants caused Novo to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Novo's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

61.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

63.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Novo common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Novo's securities at

artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

64.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Novo's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

65.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

34

66.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Novo's internal affairs.

67.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Novo's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Novo's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Novo's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

68.     During the Class Period, Novo's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Novo's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Novo's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Novo's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

69.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

70.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock

during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

71.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

72.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Novo's misstatements.

73.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Novo which had become materially false or misleading.

74.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Novo disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout

the Class Period, the Individual Defendants exercised their power and authority to cause Novo to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Novo's common stock.

75.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Novo to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

76.    By reason of the above conduct, the Individual Defendants and/or Novo are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

**<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiff hereby demands a trial by jury.


Dated: August 1, 2025                              Respectfully submitted,

                                                   **LEVI & KORSINSKY, LLP**


                                                   */s/ Adam M. Apton*
                                                   Adam M. Apton
                                                   33 Whitehall Street, 27th Floor
                                                   New York, New York 10004
                                                   Tel.: (212) 363-7500
                                                   Fax: (212) 363-7171
                                                   Email: aapton@zlk.com

                                                   *Attorneys for Plaintiff*